# E*x*ponent®

Exponent
3401 Market Street
Suite 300
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

May 21, 2010

Bradley D. Remick, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

Subject:	Jacoby v Wal-Mart
	Exponent Project No. 0906689.000

Dear Mr. Remick:

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology from and performed Honors research in psychology at Rutgers University. I hold a Ph.D. in experimental psychology from Johns Hopkins University and conducted post-doctoral research at Stanford University, with a focus in cognitive neuroscience. I am a Senior Managing Scientist at Exponent and a member of the Human Factors Practice, where I routinely address how the capabilities and limitations of people interact with the products, equipment, and systems in their environment, and how this interaction affects safety. I frequently use large-scale databases (e.g., National Electronic Injury Surveillance System) to analyze the frequency and patterns of accidents, identify patterns of unsafe behaviors, and to measure risk. I routinely analyze human factors issues in and have testified concerning accidents associated with slips/trips and falls. I regularly research and apply applicable standards and regulations in a variety of contexts.

I have studied the neural systems underlying and interacting with both controlled and reflexive motor behavior. I have investigated safety issues related to the interaction between human perception, behavior, and environmental conditions. I am actively engaged in research relating to human perception, cognition, behavior, and movement as it relates to slips, trips, stumbles, and falls. I have published papers and presented at conferences related to human factors issues, including sensory and perceptual information processing and brain functioning.

Bradley D. Remick, Esq.
May 21, 2010
Page 2

A copy of my resume is attached. Also included is a listing of depositions and trial testimony for the past four years. Exponent currently bills my time at $255 an hour. A list of the materials I have reviewed to date is also included. After reviewing the various available materials, I have the following understanding of the incident:

> On September 20, 2007, Johanna Jacoby (87 years old at the time) was involved in an incident at the Wal-Mart store in Tunkhannock.[1] After entering the Wal-Mart through automatic entrance doors, Mrs. Jacoby attempted to exit the store through the same entranceway.[2] She alleges that as she proceeded to exit through the doors, the left door hit her and she flew across the floor.[3]

Based on my review of materials listed in the attachment to the report, and my education and experience, I have determined the following:

**Mrs. Jacoby's Actions**

Mrs. Jacoby testifies that on the day of the incident, upon entering the store through the incident automatic doors she immediately proceeded to retrieve a "basket" or "cart" when "[r]ight then and there I decided I was going to go back out" to look for plants.[4] Mrs. Jacoby continues, stating that when she turned around she was approximately 10 to 15 feet from the doors, the doors were open, no one was between her and the doors, no one was standing or walking in the area, no one was entering or exiting the incident doors, and she did not remember passing anyone.[5] Mrs. Jacoby also testifies that as she approached the doors to exit the store the doors were opened away from her, she did not see any writing above the incident doors or the doors adjacent to the incident doors, and she did not see any "do not enter" sign on the door.[6] At deposition, she claims that the doors did not start to close as she approached, but rather while exiting "they started to close, they hit me."[7]

Surveillance camera footage from the time of the incident highlights a number of inconsistencies between Mrs. Jacoby's memory and the event in question (see appendix). For instance, prior to the incident, Mrs. Jacoby can be seen entering through the incident doorway, obtaining a cart with her adult granddaughter. However, rather than immediately turning to exit, she proceeds to enter the store leaving the frame of the surveillance camera. Mrs. Jacoby reenters the frame of the surveillance camera, alone and without a cart, and can be seen approaching the doors 58 seconds after entering the store.

---

[1] Deposition of Johanna Jacoby (Jacoby), pp. 8-11
[2] Jacoby, pp. 15-17; 19; Video Surveillance
[3] Jacoby, p. 25
[4] Jacoby, pp. 19-21
[5] Jacoby, pp. 23-24, 44
[6] Jacoby, pp. 24-25, 45
[7] Jacoby, p. 47

Bradley D. Remick, Esq.
May 21, 2010
Page 3

Furthermore, while Mrs. Jacoby is approaching the door another patron with a cart is positioned in front of the door. Mrs. Jacoby appears to incorporate this person's presence in her walking path; Mrs. Jacoby approaches the entrance, walking not towards the opening itself, but rather to the left of the opened door and out of the other patron's way. Mrs. Jacoby appears to reach the doorway, still oriented to the left of the doorway, and then alters her path by turning to the right in order to proceed through the opening. This path aligns her with the edge of the left door panel. As the door is seen beginning to close, Mrs. Jacoby continues to walk towards the center of the opening, maintaining her general alignment with the edge of the left door panel; the next available frame of the surveillance depicts Mrs. Jacoby falling to her right allegedly following contact with the door.

Though he references having viewed this surveillance video, plaintiff's expert, Warren Davis, fails to acknowledge or recognize this sequence of events or incorporate Mrs. Jacoby's actions into his understanding of the incident. From his description of the incident, Dr. Davis adopts aspects of Mrs. Jacoby's retelling. For instance, Dr. Davis writes that "very shortly after passing from the vestibule through the subject interior entrance door into the store proper, Mrs. Jacoby decided to turn around and exit through the same door," that "[a]lthough she had, or was just about to, retrieve a shopping cart from within the store… she attempted to exit through the interior entrance door through which she had just entered," and that the door "stood fully open at the moment Mrs. Jacoby turned around and attempted to exit through it."[8] Dr. Davis's account is misleading as to the timing of these events, and does not account for the fact that Mrs. Jacoby had spent approximately one minute within the store, that the doorway had closed before Mrs. Jacoby had left the frame of the surveillance video, and that for much of the minute the doorway remained closed except for when patrons entering caused it to open.

Dr. Davis also highlights that Mrs. Jacoby testified that no one was standing near the door at the time of the incident,[9] however, he does not clarify that the video does indeed show a woman with a cart standing in front of the entrance or that Mrs. Jacoby's chosen walking path circumvents this woman. Dr. Davis continues to mischaracterize the observed behaviors of Mrs. Jacoby by claiming that as she "entered the swing path of the subject door in her attempt to exit, the left hand panel closed upon her, striking her on her left side and knocking her to her right, apparently against the leading edge of the right hand swinging panel."[10] However, the video actually shows that Mrs. Jacoby first moved not towards the opening, but left of the open door panel. As she neared the edge of the door, she altered her direction and proceeded to make for the opening, aligning herself with and placing herself within close proximity to this edge both at the time that it was open, and while it was closing. Though Dr. Davis asserts "the surveillance video shows that when she was struck a considerable portion of Mrs. Jacoby's body was clearly in front of (that is, on the ingress side of) the closing left hand panel," inspection of the relevant video frames fails to indicate this. At no point does Mrs. Jacoby appear to be in

---

[8] Report of Dr. Davis, p. 3
[9] Report of Dr. Davis, p. 3
[10] Report of Dr. Davis, p. 4

0906689.000A0T0 0510 REPT

front of or within the swing path of the door, nor is the door observed to close upon her. Rather, the video depicts Mrs. Jacoby's chosen walking path bringing her into close proximity to the edge of the door before and during its travel, and then her falling. Additionally, from the portion of video depicting her fall, it is simply not clear whether or not Mrs. Jacoby interacted with the right door.

**Conditions of the Incident Area**

Navigation of one's local environment is a behavioral function that requires motor planning and is guided by input from multiple sensory systems, including the visual system (Colby and Olson, 2003). Visual information supports the perception of depth, distance, and slope, and aids in navigation and locomotion. As people move, the visual information reaching the eye and being processed by the visual system changes, further supporting the perception of their physical surroundings and control of motion. Visual processing of people's local environment is ongoing, occurring without conscious effort, and allows for visual information to be integrated into a person's knowledge, awareness, and expectancy and to potentially be acted upon.

On October 14, 2009 I visited the subject Wal-Mart, and observed and documented the area surrounding the incident doorway. During this visit I noted that as one enters the subject doorway, green colored signage on the door includes a directional arrow and identifies it as an "AUTOMATIC DOOR." Also, above the doorway is the word "Enter." Looking back on the entranceway, a red "DO NOT ENTER" sign is posted on the window panel. Similarly, as one looks through this entrance from inside the store, similar signage is included on a pair of automatic doors separating the vestibule from the parking lot. The signs on this additional set of doors are visible when looking through the subject doors when they are either in the open or closed position.




Bradley D. Remick, Esq.
May 21, 2010
Page 5

During this visit, I observed that the subject doors open into the store, away from patrons entering the establishment. Indeed, the doors did not open when closed and I approached them from inside the store as if to exit through them. Immediately abutting the full open position of both door panels on the interior of the store is a rail that restricts one's movement into the swing path of an opening door, and limits access to an area in which one should not stand. From a position within the store and near the subject doors, the presence and motion of each closing door panel was readily visible. Also visible when standing near the subject doors are another set of automatic doors, positioned on the other side of the shopping carts that opened toward the exterior of the store and were marked as "Exit" and labeled as to their direction of use,. The intended flow through the doorways at this Wal-Mart is well communicated; the cues referenced above, combined with the experience gained through repeated visits to this and other similar shopping establishments would highlight to a patron that the incident doorway is an entrance and that one should not exit through these doors.



Mrs. Jacoby testifies that prior to the incident she had frequented the subject Wal-Mart on a fairly regular basis.[11] She also states that at the time of the incident she did not see any "do not enter" signs as she approached the door.[12] Given her position throughout her approach relative to the door, it is likely that she would not have faced the signage posted on the doorway during or immediately prior to the incident. Dr. Davis's assertion that additional signage, compliant with the ANSI Z535.4 standard, affixed to the door would have averted this incident[13] is simply unfounded since any additional signage affixed to the door would have been equally outside Mrs. Jacoby's line of sight.

Furthermore, scientific research on the effectiveness of posted warnings does not support this conclusion. The presence of signage does not guarantee that signs will be noticed. For example, in one study (Smith-Jackson & Durak, 2000), subjects performed a "chemistry-lab" task and were exposed to either no warning concerning the wearing of

---

[11] Jacoby, pp. 11, 20
[12] Jacoby, p. 45
[13] Report of Dr. Davis, pp.12-14

Bradley D. Remick, Esq.
May 21, 2010
Page 6

gloves and goggles, a text-only warning, or a warning consistent with design components identified in the warnings literature suggested to increase sign conspicuity (e.g., color). None of the participants looked at or read the posted warnings. Similarly, low rates of sign awareness have been reported in published research on "No Diving" signs at shallow ends of pools and warning labels affixed to consumer products (Goldhaber, 1988; Goldhaber, 1989); I, too, have confirmed this phenomenon in my own research on warnings.

Even when signs are looked at or read, compliance is not guaranteed. For example, in a field study experiment (Wogalter et al., 1987) pedestrians compliance with a sign reading "WARNING", "BROKEN DOOR", "COULD INJURE", "USE ANOTHER EXIT" was observed. The sign was ineffective in motivating people to alter their exit path when directed to an alternative exit only 50 feet away. People's exit door choice was only affected when the sign directed them to the immediately adjacent door, though even this condition did not meet with 100% compliance. Additionally, studies show that people greatly overestimate their own compliance rates with warnings (Ayres et al., 1990; Dorris and Purswell, 1977). They systematically estimate that their own compliance levels would be higher than those of other people, even while overestimating others' compliance. For example, when presented with a label on hammers, subjects predicted they would have a 50% compliance rate on average and that other people would comply at an average rate of 42%. Actual compliance with the warnings was zero.

Dr. Davis is additionally critical of the procedures in place at the Wal-Mart, specifically claiming that Wal-Mart was not performing proper and required *Daily Safety Checks* on the subject door.[14] On May 20, 2010, I took part in a telephone conversation with Stephen Gemmel, Manager of Product Support at Stanley Black & Decker. Mr. Gemmel informed me that the Terms and Conditions of agreement between Stanley Black & Decker and Wal-Mart specifically removed from Wal-Mart the responsibility and requirement to perform the *Daily Safety Checks*, in part due to other control mechanisms in place including service agreements and surveillance of the doors. In addition to the video surveillance, Sharon Evancavich, assistant manager at the incident Wal-Mart,[15] testifies that Wal-Mart personnel either standing at or passing through the various doorways allow for immediate notification if an issue arises related to door usage or functioning and a call to "Stanley Door" is made for service.[16] Ms. Evancavich further testifies that it was protocol to call the service company for an inspection following a customer incident related to a door[17], consistent with Wal-Mart's written policy.[18] In the present instance, a Stanley Service Request Form dated September 21, 2007 indicates that such a call was

---

[14] Report of Dr. Davis, p. 8
[15] Deposition of Sharon Evancavich, p. 8
[16] Evancavich, pp. 52-53, 57-60
[17] Evancavich, pp. 129-130;
[18] Evancavich Exhibit #2

0906689.000A0T0 0510 REPT

made,[19] and a subsequent service report from September 22, 2007 indicates "ALL SENSORS & OPERATORS WORKING PROPERLY."[20]

**Summary of opinions and conclusions**

In summary, the opinions in this report are stated to a reasonable degree of scientific certainty and include the following:

- Mrs. Jacoby chose to approach an open entrance doorway, maneuver around a patron, and align herself with and travel within close proximity to the edge of the door in order to exit through the entranceway rather than utilizing a readily available exit.

- Mrs. Jacoby did not notice, attend, or heed a number of indications that the doorway in question was not an exit. There is no scientific reason to believe that additional or alternative warnings would have altered her walking behavior.

- Wal-Mart monitors the store's doorways and is contracted with Stanley Black & Decker for service and maintenance of the automatic doors. From the information available, there was no evidence or notice to Wal-Mart of the alleged hazard prior to the incident. Wal-Mart's call for Stanley Access Technologies to investigate the doors following the incident was an appropriate response.

I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work. If required to testify, I plan to use exhibits created from the materials referenced in this report to help illustrate the opinions presented herein.

Sincerely,

Joseph B. Sala, Ph.D.
Senior Managing Scientist
Human Factors

---

[19] Stanley Service Request Form, Notification #: 10829308
[20] Stanley Access Technologies, Service Work Order No. 4785830

Bradley D. Remick, Esq.
May 21, 2010
Page 8

**List of Materials**

- Answers to Complaints
- Answers of Defendant, Wal-Mart Stores, Inc. to Plaintiff's First Set of Interrogatories
- Answers of Defendant, Wal-Mart Stores, Inc. to Plaintiff's First Request for Production Documents
- Initial Disclosures
- Plaintiff's Answers to Expert Witness Interrogatories of Defendant, Wal-Mart, Directed to Plaintiff
- Plaintiff's Answers to Supplemental Door Interrogatories of Defendant, Wal-Mart, Directed to Plaintiff
- Plaintiff's First Request for Production of Documents Directed to Defendant, Wal-Mart
- Plaintiff's First Set of Interrogatories Directed to Defendant, Wal-Mart
- Plaintiff's Asnwers to Bodily Injury Interrogatories of Defendant, Wal-Mart Directed to Plaintiff
- Plaintiff's Responses Request for Production of Documents to Defendant Wal-Mart
- Plaintiff's Answers to Product Interrogatories of Defendant, Wal-Mart Directed to Plaintiff
- Plaintiff's Discovery Disclosure
- Summons
- Wal-Mart Claim form
- Depositions
  - Johanna Jacoby 10-26-2009
  - Sharon Evancavich 10-26-2009
  - Timothy Carey 10-20-2009
- Expert Report of Warren Davis dated May 7, 2010
- Medical Evaluation of Johanna Jacoby
- Wal-Mart surveillance video
- Photographs of the incident doorway
- Stanley production documents
- Wal-Mart production documents

- Exponent inspection photos and video taken 10-14-2009

**Appendix: Surveillance Video Frames**



**09:32:58 – Mrs. Jacoby and granddaughter enter through incident doorway**



**09:33:09 – Mrs. Jacoby and granddaughter enter store, leaving frame of surveillance video**



**09:33:56 – Mrs. Jacoby re-enters frame of surveillance video, approaching doorway**



**09:33:59 – Mrs. Jacoby approaching doorway on left, passing patron with cart**


**09:34:00 – Mrs. Jacoby approaching doorway on left, heading toward opening**


**09:34:01 – Mrs. Jacoby approaching doorway, aligned with edge of door**



**09:34:02 – Mrs. Jacoby continuing toward opening, aligned with edge of closing doorway**



**09:34:02 – Mrs. Jacoby falling, following alleged contact with the door**



Exponent
3401 Market Street
Suite 300
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

**Joseph B. Sala, Ph.D.**
Managing Scientist

**Professional Profile**

Dr. Joseph B. Sala is a Managing Scientist in Exponent's Human Factors practice. Dr. Sala's work focuses on the cognitive, perceptual, physical, and developmental human factors issues relating to accidents and injuries. Dr. Sala applies this expertise to the analysis of visibility, the effect of attention on human performance, lifespan and age differences in behavior, human information processing and decision-making, and the development and evaluation of warning and safety information. He has analyzed human factors issues in accidents associated with a number of scenarios (e.g., motor vehicles, consumer products usage, slips/trips and falls, recreational activities) resulting in a variety of injuries (e.g., burns and scalds, submersions, mechanical suffocation, electrocutions, poisonings).

Using large-scale incident and injury data (e.g., the Consumer Product Safety Commission's National Electronic Injury Surveillance System, Centers for Disease Control's Wide-ranging Online Data for Epidemiologic Research, etc.), Dr. Sala has performed injury and risk analysis to measure the safety of products, and he has examined the effectiveness of some of the strategies used to reduce risk. In addition, he has used his experience to conduct product usability studies and to examine the physical and cognitive abilities of both child and adult users as they interact with particular products and environments.

Prior to joining Exponent, Dr. Sala completed a Ph.D. in psychology at the Johns Hopkins University and was a post-doctoral fellow at Stanford University. During that time he focused his research on the cognitive neuroscience of human information processing, the brain mechanisms underlying learning, memory, vision, and cognitive control, and their behavioral manifestations. In his research, he used a variety of experimental methods (behavioral, neuroimaging, and patient case studies) and statistical analyses to explore the interactions between learning, vision, working memory, and attention.

**Academic Credentials and Professional Honors**

Post Doctoral Fellow, Stanford University
Ph.D., Psychological and Brain Sciences, Johns Hopkins University, 2003
M.A., Psychological and Brain Sciences, Johns Hopkins University, 2001
B.A., Psychology, Rutgers University, 1998
B.S., Administration of Justice, Rutgers University, 1998

Lecturer, Drexel University, 2007–2008; National Research Service Award training grant through the Department of Neurobiology, Stanford University, 2004–2005; J. Brien Key Graduate Award, 2002, 2000; National Science Foundation Graduate Research Fellowship Honorable Mention, 2000; Edward J. Bloustein Distinguished Scholar, 1994–1998

06/08

**Publications**

Sala JB, Courtney SM.  Binding of what and where during working memory maintenance.  Cortex 2007; 43:5–21.

Huntley-Fenner G, Wood CT, Sala JB.  Study of the impact of California's Proposition 65 warnings on safety related awareness and behaviors.  Proceedings, Society for Risk Analysis, San Antonio TX, December 9–12, 2007.

Courtney SM, Roth JK, Sala JB.  A hierarchical biased-competition model of domain-dependent working memory maintenance and executive control.  In:  The Cognitive Neuroscience of Working Memory.  Oxford University Press, 2007.

Wood CT, Sala JB, Sanders K, Cassidy P.  Trends in consumer product warnings.  Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Sanders K, Wood CT, Sala JB.  Human factors engineering for medical devices.  In:  Bringing Your Medical Device to Market.  Food Drug Law Institute, Washington, D.C., 2006.

Sayala S, Sala JB, Courntey SM.  Increased neural efficiency with repeated performance of a working memory task is information-type dependent.  Cerebral Cortex 2006; 16: 609–617.

Preston A, Gaare M, Sala JB, Wagner AD.  Stimulus-specific novelty encoding and subsequent memory responses in human medial temporal lobe.  Cognitive Neuroscience Society Annual Meeting Abstracts, New York, NY, April 9–12, 2005.

Rämä P, Poremba A, Sala JB, Yee L, Malloy M, Mishkin M, Courtney SM.  Dissociable functional cortical topographies for working memory maintenance of voice identity and location.  Cerebral Cortex 2004, 14:768–780.

Sayala S, Sala JB, Courtney SM.  Spatially selective changes in fMRI activation during repeated performance of working memory tasks.  Society For Neuroscience Annual Meeting Abstracts, San Diego CA, October 23–27, 2004.

Sala JB, Badre D, Wagner AD.  Investigating effective connectivity of prefrontal cortex and cognitive control using dynamic causal modeling.  Poster presented at Bay Area Memory Meeting, 2004.

Sala JB, Courtney SM.  Active maintenance and the binding of information during working memory.  Cognitive Neuroscience Society Annual Meeting Abstracts, San Francisco CA, April 18–20, 2004.

Sala JB, Rama P, Courtney SM.  Functional topography of a distributed neural system for spatial and nonspatial information maintenance in working memory.  Neuropsychologia 2003, 41(3):341–356.



Sala JB, Sayala S, Courtney SM.  Altered working memory activation pattern in a multiple sclerosis patient with superior frontal white matter lesions.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8-12, 2003.

Sayala S, Sala JB, Courtney SM.  Changes in parietal cortex during repeated performance of working memory tasks.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8–12, 2003.

Yee L, Sala JB, Courtney SM.  Working memory for color versus shape.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8–12, 2003.

Sala JB, Courtney SM.  Contribution of non-preferred information to activation during working memory for objects-in-locations.  Society for Neuroscience Annual Meeting Abstracts, Orlando FL, November 2–7, 2002.

Sala JB, Courtney SM.  Working memory for the conjunction of pattern identity and location.  Human Brain Mapping Annual Meeting Abstracts, Sendai Japan, June 10–16, 2002.

Rämä P, Sala JB, Gillen JS, Pekar JJ, Courtney SM.  Dissociation of the neural systems for working memory maintenance of verbal and nonspatial visual information.  Cognitive, Affective, & Behavioral Neuroscience 2001; 1(2):161–171.

Sala JB, Rämä P, Courtney SM.  Patterns of activation during encoding, maintenance and recognition phases of a working memory task.  Society for Neuroscience Annual Meeting Abstracts, San Diego CA, November 10–15, 2001.

Sala JB, Rämä P, Courtney SM.  Modulation of perceptual processing during encoding versus recognition in working memory.  Talk presented at Attention and Capture Conference – Eastern Psychological Association, Baltimore MD, 2001.

Sala JB, Rämä P, Courtney SM.  Involvement of spatially specialized areas in object working memory.  Cognitive Neuroscience Society Annual Meeting Abstracts, New York NY, 2001.

Sala JB, Rämä P, Gillen JS, Courtney SM.  Working memory for identity and location of faces or houses: an fMRI investigation.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 4–9, 2000.

Rämä P, Sala JB, Gillen JS, Courtney SM.  Working memory for famous and unfamous faces and names.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 4–9, 2000.

**Peer Reviewer**

Invited Reviewer: *Journal of Neuroscience, NeuroImage, Cognitive Brain Research,* and *Behavioral and Cognitive Neuroscience Reviews*, *Human Factors and Ergonomics Society*

Joseph B. Sala, Ph.D.
Page 3
06/08



**Project Experience**

Evaluated the visibility of pedestrians and other roadway objects, assessing the effects of a variety of factors such as lighting and potential obstructions.

Assessed the adequacy of a variety of product related safety information in a number of "failure to warn" claims. Considered alternative or additional information and its potential to produce behavioral change and or result in accident avoidance.

Designed testing protocols to address the cognitive, behavioral, and physical abilities of children. Evaluated the design of a wide variety of products and attempts to limit child access and activation.

Performed quantitative and comparative injury risk analysis across a wide variety of consumer, recreational, and occupational products.

Assisted manufacturers to respond to governmental agency (e.g., CPSC, FDA, EPA) inquiries regarding product safety, recall, and regulatory matters.

Developed, revised, and commented on warnings, labeling, and instructions for an array of consumer, recreational, and occupational products.

Assessed the conspicuity of a variety of environmental stimuli, relating physical attributes to the capabilities and limitations of human sensory systems and associating these factors to accident causation and avoidance.

Studied public awareness and understanding of posted warnings and the effect this signage may have on human behavior.

Assisted manufacturers in the development of internal design standards addressing potential hazards and increasing consistency across products.

**Professional Affiliations**

- Society for Neuroscience
- Society for Risk Analysis
- Human Factors and Ergonomics Society
- Association for Psychological Science



**Previous Four Years of Deposition and Trial Testimony by Joseph B. Sala**
**February 9, 2010**
(based on best available data)

| Deposition Date | Trial Date | Case Name | Case Client | Court | Case # |
|---|---|---|---|---|---|
| 09/2006 | | Sedillos v. Louis Park Estates, HOA | Kurt Bridgman - Low, Ball & Lynch San Francisco, CA | Superior Court of the State of California in and for the County of San Joaquin | CV-024813 |
| 10/2007 | | Lankford v. Skaff Engineering | Nora Price - Steptoe & Johnson Hungtington, WV | Commonwealth of Kentucky Letcher Circuit Court | 06-CI-00364 |
| 08/2008 | | DiRosa v. Asphalt Paving Systems | Joseph Assan - Dempster & Haddix Mt. Laurel, NJ | Superior Court of New Jersey Law Division - Camden County | CAM-L-8016-06 |
| 12/2009 | | Bragdon v. Karl R. Johnson Trucking, Inc. and Delbert Degree | F. Brian (Ted) Joslin - Theriault & Joslin, P.C. Montpelier, VT | Caledonia Superior Court - State of Vermont | 154-5-08 Cacv |
| | 01/2010 | Izikoff v. Nissan North America, Inc. | John Randolph Bibb, Jr. - Lewis, King, Krieg & Waldrop, P.C. Nashville, TN | Circuit Court of Suner County, Tennessee for the Eighteenth Judicial Distrcit at Gallatin | 30337-C |
| | 01/2010 | Bragdon v. Karl R. Johnson Trucking, Inc. and Delbert Degree | F. Brian (Ted) Joslin - Theriault & Joslin, P.C. Montpelier, VT | Caledonia Superior Court - State of Vermont | 154-5-08 Cacv |
| | 01/2010 | McLaughlin v. John F. Kennedy Catholic High School | Daniel W. Morrison - Bleakley Platt & Schmidt LLP White Plains, NY | Supreme Court of the State of New York County of New York | 104747/06 |
| 02/2010 | | Mendez v. Estwing Manufacturing Company, Inc. | Marcus R. Tucker - Royston, Rayzor, Vickery and Williams, L.L.P. Houston, TX | United States District Court for the Southern District of Texas, Houston Division | C.A. No. 90-572 |
| | 02/2010 | Rosado v. Onarato | John P. Connors, Jr. - Connors & Connors, P.C. Staten Island, NY | Supreme Court of the State of New York County of Richmond | 102759/06 |